IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

GLORIA  D. BRATT,                           )          4:06CV3262
                                            )
                    Plaintiff,              )
          vs.                               )          **MEMORANDUM**
                                            )          **AND ORDER**
MICHAEL J. ASTRUE,                          )
Commissioner of the                         )
Social Security Administration,             )
                                            )
                    Defendant.              )

         In this Social Security appeal, the plaintiff contends that the Commissioner's decision to deny her disability insurance benefits and supplemental security income is contrary to law and not supported by the evidence.  After careful review of the administrative record, I find that the Commissioner's decision should be affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  BACKGROUND

         The plaintiff, Gloria D. Bratt, applied for disability insurance benefits and supplemental security income in October 2002, when she was 30 years old.  The alleged onset date of her disability is December 31, 2000.  Bratt has a high school education plus one year of college, but a limited employment history.  She was last insured for purposes of Title II of the Social Security Act on June 31, 2001.

         Bratt's left eye was surgically removed in 1995 because of a detached retina; the central visual acuity of her right eye is 20/30.  Bratt was taken to an emergency room for suicide observation on October 16, 2000, and since then has been treated with medication and counseling for depression and other psychiatric disorders.

Bratt's application was denied initially on February 13, 2003, and again on reconsideration on March 28, 2003. At Bratt's request, an administrative hearing was held on May 19, 2004. Testimony was provided by Bratt, who was represented by counsel, and also by a medical expert ("ME") and a vocational expert ("VE") who were both under contract with the Social Security Administration. When the VE was unable to answer questions by Bratt's attorney regarding the vision requirements for various occupations that Bratt was deemed capable of performing, the administrative law judge ("ALJ") directed the VE to submit a written report.

The VE's report was prepared immediately following the hearing and was forwarded to Bratt's attorney by the ALJ on June 9, 2004. In response, on June 16, 2004, Bratt's attorney requested a supplemental hearing. On June 18, 2004, the ALJ sent a questionnaire to Bratt's eye doctor, Larry W. Wood, M.D., inquiring whether Bratt's vision was adequate to perform six listed occupations, based on the vision requirements listed in the Dictionary of Occupational Titles ("DOT") and identified in the VE's memo. Dr. Wood replied on June 23, 2004, that Bratt's central visual acuity in the right eye of 20/30 "should not prevent Gloria from carrying out any of the described job activities which include car washing attendant, hand packager, kitchen helper, laundry folder, cafeteria attendant, and motel housekeeper." (Tr. 348.) The ALJ forwarded this response to Bratt's attorney on August 4, 2004. In response, on August 10, 2004, Bratt's attorney submitted additional questions for Dr. Wood, as authorized by the ALJ's transmittal letter, and also renewed the request for a supplemental hearing. The ALJ does not appear to have submitted the additional questions to Dr. Wood or to have acted upon the requests for a supplemental hearing before issuing an unfavorable decision on December 21, 2004.

Bratt filed a request for further review on January 24, 2005, which was granted by the Appeals Council on May 4, 2005. The Appeals Council vacated the hearing decision and remanded the case to the ALJ with directions to conduct the requested supplemental hearing and to include in the case new claims for Title II and Title XVI benefits that were filed by Bratt on February 15, 2005.

The supplemental hearing was held on July 27, 2005. Dr. Wood testified by telephone after having been subpoenaed by the ALJ, and the VE was recalled for further examination by Bratt's attorney. Bratt did not testify again.

## A.  The ALJ's Findings

On October 19, 2005, the ALJ issued another unfavorable decision. The ALJ's findings were identical to the those made previously. Among other things, the ALJ found (1) that Bratt had not performed substantial and gainful activity since the alleged disability onset date of December 31, 2000; (2) that Bratt has lattice degenerative disease in the right eye with central visual acuity of 20/30 and is blind in the left eye with a prosthetic, and has a post traumatic stress disorder, a mixed personality disorder, and a history of alcohol and marijuana use; (3) that while these impairments impose more than slight limitations on Bratt's ability to function, they do not meet or equal one of the listed impairments under 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) that Bratt is mentally able to do routine, repetitive unskilled work under ordinary supervision with brief, superficial social contact, but due to her vision should avoid hazards and jobs requiring depth perception, although she can perform tasks with occasional need for fine acuity; and (5) that while Bratt's restrictions prevent her from performing her past relevant work as a nursery school attendant, a deli cutter-slicer and cashier-checker, she possesses the residual functional capacity ("RFC") for other work that exists in the regional and national economies in significant numbers.

## B.  Issues on Appeal

Bratt filed a request for review of this decision on December 21, 2005, which was denied by the Appeals Council on September 8, 2006. This action was timely filed on November 6, 2006. Bratt requests that the ALJ's decision be reversed and the case remanded for payment of benefits because:

1.      In assessing Bratt's RFC, the ALJ wrongly discounted the opinions of an examining psychiatrist and failed to include all visual limitations testified to by Dr. Wood;

2.      The ALJ failed to assess Bratt's credibility in accordance with <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984); and

3.      The ALJ treated Dr. Wood as a vocational expert and failed to resolve a conflict between the VE's testimony and the DOT.

## II. DISCUSSION

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  <u>Hogan v. Apfel</u>, 239 F.3d 958, 960 (8th Cir. 2001).  "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. <u>Id.</u>, at 960-61; <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012 (8th Cir. 2000).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  <u>See</u> <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo. <u>Olson v. Apfel</u>, 170 F.3d 820, 822 (8th Cir. 1999); <u>Boock v. Shalala</u>, 48 F.3d 348, 351 n.2 (8th Cir. 1995); <u>Smith</u>, 982 F.2d at 311.

The Social Security Administration uses a five-step process to determine whether a claimant is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520 and 416.920.

At the first step, the claimant must establish that she has not engaged in substantial gainful activity.  The second step requires that the claimant

4

prove she has a severe impairment that significantly limits her physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove she lacks the residual functional capacity to perform her past relevant work. Finally, if the claimant establishes that she cannot perform her past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006). "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Id. (internal quotations and citations omitted).

### A.   Medical Opinions

Bratt complains that the ALJ rejected the opinion of a psychiatrist, Rafael Tatay, M.D., who was hired by the state agency to examine Bratt in connection with her most recent application for benefits. Dr. Tatay's report was summarized by the ALJ as follows:

On March 31, 2005, the claimant underwent psychological evaluation by Dr. Tatay secondary to the application filed herein. . . . The claimant reported that since she lost the sight of her left eye secondary to retinal detachment "that was the beginning of so many of her medical problems that according to her [are the] major reason for her depression and incapacitation." She reported a history of a suicide attempt at age 16 but no current suicidal ideation. For the most part she reported mood swings, anxiety and anger problems. Medications had been "very

helpful to her."  Her intelligence was noted to be "at least average" and she was noted to have no problem sustaining attention and concentration needed for task completion or remembering short and simple instructions.  He noted some suspiciousness of others and some limited ability to handle stress.   There was no evidence of a memory impairment.  Her diagnoses included mood disorder NOS, particularly depressed, rule out bipolar disorder I mixed most recent episode depressed and alcohol dependence by history, currently in remission.  He estimated that her Global Assessment of Functioning was 45 and concludes, "At this point, the claimant's psychiatric conditions appears to have improved due to the claimant having reached emotional maturity, having resolved some of traumas of her childhood and also having worked hard and reached a state of sobriety."  (Exhibit 22F)

(Tr. 25-26.)  The ALJ specifically rejected Dr. Tatay's opinion that Bratt had a Global Assessment of Functioning score of 45, stating that:

> The opinion of Dr. Tatay that the claimant's Global Assessment of Functioning was 45 is not supported by the evidence of record and is based upon a 1 time evaluation.  Recent evaluation by the Disability Determination Serves [sic] doctors noted that she was under no treatment and revealed moderate limitations in only 3 areas whereas previously there were 10 areas of moderate limitation.  This seems to indicate improvement and does not support Dr. Tatay's opinion.  A GAF of 45 would indicate that she was suicidal and she specifically denied suicidal ideation.  She merely mentioned mood swings and anxiety.

> At the hearing, the medical expert opined that he felt that the claimant, from an emotional standpoint was capable of performing work.  Additionally, he indicated that, if the claimant does not use drugs and is compliant with treatment, he felt that she would be able to perform routine, repetitive work of an unskilled nature with ordinary supervision and brief superficial contact.  The medical expert noted that her current Global Assessment of Functioning was 60 and 65 which would indicate "relatively little degree of impairment."

(Tr. 31.)

6

Global Assessment of Functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 30-32 (4th ed. 1994) ("DSM-IV").  A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  See DSM-IV at 32.  A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  See id.

Bratt argues that the ALJ impermissibly gave more weight to the opinions of non-examining medical sources than she did to the opinions of Dr. Tatay.  While it is true that the psychologists in the Nebraska Disability Determination Section who prepared mental RFC assessments, and the ME who testified, did not personally examine Bratt, they relied upon reports from examining medical sources that gave better GAF scores than Dr. Tatay's report.  These other reports are discussed in the ALJ's decision and support the ALJ's rejection of Dr. Tatay's Axis V diagnosis that Bratt's symptoms were serious in April 2005.[1]

For example, Bratt was hospitalized in a partial care program on January 25, 2002, after she reported to Walter Duffy, M.D., that she was stressed because her caseworker had told her that she needed to find a job, she was being investigated by Child Protective Services for alleged abuse or neglect, her live-in boyfriend had lost his job, and they had received an eviction notice.  Dr. Duffy reported that Bratt's GAF at the time of admission was 45, and that her highest GAF in the past year was perhaps 55 to 60.  (Tr. 334.)  Bratt was inconsistent in coming to treatment, and was

---

[1] Although not discussed by the ALJ, Dr. Tatay's report was prepared nearly four years after Bratt was last insured for disability insurance benefits.

7

discharged from the partial care program on February 5, 2002.  Dr. Duffy reported that Bratt's GAF at the time of her discharge was 50.  (Tr. 330.)  Bratt was referred to the hospital's counseling center for therapy, but she failed to participate in that program.  (Tr. 335-336.)  On February 5, 2003, Bratt was examined by a consulting psychologist, Robert B. Arias, Ph.D., who reported that her GAF was 65.  (Tr. 259.)  Another consulting psychologist, Ryan Ernst, Psy.D., examined Bratt on May 20, 2003, and reported that her GAF was 60.  (Tr. 309.)

Apart from the low GAF score, Dr. Tatay's findings are not significantly different from those of Dr. Duffy, Dr. Arias, and Dr. Ernst.  In fact, the ALJ's assessment that Bratt "is mentally able to do routine, repetitive unskilled work under ordinary supervision with brief/superficial social contact" (Tr. 34) is consistent with the narrative portion of Dr. Tatay's report, in which he states:

> On the rest of my examination, my impression [is] that Ms. Bratt has restriction of activities of daily living primarily due to her limited vision. She seemed to be fairly stable with the current dosage of medication and from her history, there has been improvement in her mood and behavior since she has stopped drinking and since she is now more compliant with psychiatric treatment and participating in treatment.  The claimant has serious difficulties maintaining social functioning.  Again her vision is a major problem. . . .  The claimant is able to sustain attention and concentration needed for task completion and she can remember short and simple instructions[;] that was fairly obvious during the examination.  There was no evidence of memory impairment.  Her ability to carry out short and simple instruction[s] under ordinary supervision is impaired by the claimant's suspiciousness of others and [she] has a limited ability to tolerate stress due to her mood instability. She is likely to become somewhat paranoid and suspicious if under significant stress with others.  Her up bringing, past history of abuse, and tendency to withdraw and use alcohol in the past are the factors that contribute to those symptoms.  Ability to relate appropriately to coworkers and supervisors is present, but impaired for the reasons described before[,] including limited social skills and problems with social skills.  The claimant is able to adapt to changes in her

environment especially with the help of her boyfriend and in fact she seems to have developed some stability in her family life recently. She is capable of managing her own funds, being competent in basic arithmetic having completed a year of college.

(Tr. 372-373.) Thus, I find no error in the ALJ's treatment of Dr. Tatay's opinion.

Regarding the ALJ's assessment of Bratt's vision problems, Bratt complains that the ALJ seemed to forget about the following testimony provided by the treating ophthalmologist, Dr. Wood, at the supplemental hearing:

ALJ: Okay. Lastly, [Bratt] had testified, and I'm reading from the last decision. But she testified that her vision varies from day to day, the abrupt changes in lighting caused problems. That she has, sometimes has trouble going from inside to outdoors, the she has problems if it's cloudy and that when her vision is acting up it effects [sic] her ability to read and see fine items. She stated that the last two years she has developed a film over her vision. She said that computer work is hard for her eyes, she tries to get large print items and books on tape. Does that sound generally—

[Dr. Wood]: That sounds reasonable. I last examined her almost a year ago, but what you're describing to me could be expected with her condition. So there are situations going light to dark, dark to light, very bright lights. A constant need to see small fonts on the computer screen, her level of vision would present some problems, yes.

(Tr. 455-456.) Basically, Dr. Wood testified that he considered Bratt's subjective complaints about her vision to be credible. Strictly speaking, this is not a "medical opinion" that must be given deference.[2]  See S.S.R. 96-5p, 1996 WL 374183, *2

---

[2] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1) and 416.927(a)(1).

(S.S.A. July 2, 1996) ("Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but [instead] are administrative findings that are dispositive of a case," including RFC determinations, for example; "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").

It is within the province of the ALJ to decide, at least in the first instance, whether to believe a claimant. See Andrews v. Schweiker, 680 F.2d 559, 561 (8th Cir. 1982). In this case, the ALJ noted that "[a]t the hearing, the claimant emphasized her visual impairment indicating that her condition varies greatly from day today [sic] and can be severely disabling on some days." (Tr. 30.) The ALJ determined that Bratt's testimony was not credible, stating:

> The records from her treating ophthalmologists [sic], Dr. Wood, do not support her testimony. It appears from the record that he has only seen her in for follow-up of her eye conditions providing reassurance at each visit. . . . In fact, Dr. Wood indicated that the claimant's medical condition has improved since he first started treating her. He indicates that the only specific activity which would aggravate the claimant's condition is "contact sports."

(Tr. 30.) Dr. Wood's testimony at the supplemental hearing did not specifically address the claimed day-to-day fluctuations in Bratt's vision, and I find no cause to set aside this particular credibility determination.

The ALJ acknowledged Bratt's further testimony that she has problems with changing light conditions and with working on a computer, but did not include these limitations in her RFC assessment. Because the ALJ did not make a specific finding that such testimony lacked credibility (which would be difficult finding to make in the face of Dr. Wood's testimony at the supplemental hearing),[3] the failure to include

---

[3] Even though Dr. Wood's testimony was not a "medical opinion", it could not be ignored by the ALJ. "If the case record contains an opinion from a medical source

these limitations in the RFC assessment, or in the hypothetical question that was presented to the VE at the initial hearing, is potentially problematic. However, as will be discussed below, the omissions did not affect the outcome of the case at step five.

In order to constitute substantial evidence, testimony from a VE must be based on a properly phrased hypothetical question. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir.1999). Such a hypothetical "should precisely set out the claimant's particular physical and mental impairments." Id. (quoting House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994)). The hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the "concrete consequences" of those impairments. Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (quoting Roe v. Chater, 92 F.3d 672, 676-77 (8th Cir.1996)). Thus, the ALJ's hypothetical question must include those impairments that are substantially supported by the record as a whole. Porch v. Chater, 115 F.3d 567, 572 (8th Cir. 1997).

Although the ALJ did not utilize Dr. Wood's testimony that Bratt could have problems with changing light conditions and not be able to see small fonts on a computer screen, there is no evidence that these limitations would prevent her from performing any of the occupations that were identified by the VE as being suitable employment for a person with Bratt's other visual limitations. Those occupations are: motel/hotel housekeeper (DOT 323.687-014); kitchen helper (DOT 318.687-010); laundry folder (DOT 369.687-018); and cafeteria attendant (DOT 311.677-010).[4]

---

on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." S.S.R. 96-5p, 1996 WL 374183 at *3.

[4] The VE also identified two other occupations at the initial hearing, car wash attendant (DOT 915.667-010) and hand packager (DOT 920.587-018), but eliminated those occupations from consideration at the supplemental hearing because of Bratt's lack of depth perception.

(Tr. 218-223). The detailed descriptions of these occupations in the Dictionary of Occupational Titles[5] likewise fail to indicate that any of them would require use of a computer or involve changing light conditions, although it is reasonable to assume that a housekeeper at some motels would be required to move between indoor and outdoor locations in order to perform her tasks.[6] To the extent that this is a matter requiring expert testimony, I note that the VE heard Dr. Wood's testimony at the supplemental hearing and was asked by the ALJ whether anything about it changed his opinion. The VE responded that all four occupations "would still fit within the hypothetical – within his testimony." (Tr. 483.) I find this response to be sufficient, without need for any restatement of the hypothetical question to include the additional limitations respecting Bratt's visual limitations.

### B. Claimant's Credibility

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing Polaski). The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole. Id. at 972. Where adequately explained and supported, credibility findings are for the ALJ to make. Id. (citing Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir.2000)).

------

[5] The Dictionary of Occupational Titles (4th ed. 1991) is available on the internet at the website of the U.S. Department of Labor, Office of Administrative Law Judges, www.oalj.doj.gov.

[6] Even if all motel/hotel housekeeping jobs in the region were to be eliminated by this factor, there are still enough kitchen helpers, laundry folders, and cafeteria attendants to support the ALJ's finding that work is available for Bratt.

The ALJ's credibility determination regarding Bratt's vision problems has already been discussed.  Regarding Bratt's mental condition, frankly, I am unable to find anything in her testimony or answers to interrogatories that even required the ALJ to make a credibility determination.  Any work-related problems or restrictions in daily activities claimed by Bratt concerned her impaired vision.  Even so, the ALJ discussed that Bratt had been noncompliant with treatment and was not currently taking any medication, and that there are several indications in the medical records that Bratt was exaggerating her symptoms in order to obtain disability payments.

The ALJ is not required to discuss methodically each Polaski consideration, so long as she acknowledges and examines those considerations before discounting the subjective complaints.  Id. (citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir.1996)).  The ALJ's decision in this case cites Polaski, and also quotes Social Security Ruling 96-7p and 20 C.F.R. §§ 404.1529 and 416.929.  (Tr. 26-28)  Based upon my review of the ALJ's decision in its entirety, and considering the nature of Bratt's complaints, I am satisfied that a proper credibility determination was made in this case.

### C.  Vocational Evidence

Once it has been determined that the claimant's RFC does not permit her to perform her past relevant employment, the issue at step five is whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience.  Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004).  Generally, if the claimant suffers from nonexertional impairments that limit her ability to perform the full range of work described in one of the specific categories set forth in the medical-vocational guidelines, the ALJ is required to utilize testimony of a vocational expert.  Draper v. Barnhart, 425 F.3d 1127, 1132 (8th Cir. 2005).

Testimony provided by the VE in this case, and associated testimony provided by Dr. Wood, were summarized as follows in the ALJ's decision:

13

At the first hearing in this matter, Steve Kuhn, a highly qualified Vocational Expert under contract with the Office of Hearings and Appeals of the Social Security Administration, was asked a series of questions – one of which included the Claimant's age, education and work experience, as well as the assessment of her residual functional capacity set forth earlier in this decision.   In response to such questioning, the Vocational Expert listed various light and medium occupations that exist in the regional economy.   Examples of such occupations included:

|  | In Nebraska | | In the National Economy | |
|  | Light | Medium | Light | Medium |
| 1. Motel Housekeeper | 1,500 | 1,500 | 200,000 | 300,000 |
| 2. Hand Packager | 1,000 | 500 | 40,000 | 100,000 |
| 3. Kitchen Helper | 2,000 | 2,000 | 200,000 | 100,000 |
| 4. Car Wash Attendant | 250 | 700 | 40,000 | 100,000 |
| 5. Laundry Folder | 4,000 | 2,000 | 600,000 | 120,000 |
| 6. Cafeteria Attendant | 600 | 2,000 | 40,000 | 120,000 |

It is clear from the vocational expert's testimony that such occupations exist in the regional economy in significant numbers.

Additionally, the vocational expert identified the above listed jobs from the Dictionary of Occupational Titles with the following visual requirements:

|  | Near Acuity | Far Acuity | Depth Perception | Accommodation |
| 1. Motel Housekeeper | never | never | never | never |
| 2. Hand Packager | occasional | never | occasional | never |
| 3. Kitchen Helper | never | never | never | never |
| 4. Car Wash Attendant | occasional | never | frequent | never |
| 5. Laundry Folder | frequent | never | never | occasional |
| 6. Cafeteria Attendant | occasional | never | never | never |

The above information was submitted to Dr. Wood and he was asked "whether her vision is adequate to perform any or all of the above jobs?" The doctor replied in a letter dated June 23, 2004 "last examination of Gloria Bratt on August 19, 2003 revealed central visual acuity in the right eye of 20/30.  This central vision should not prevent Gloria from carrying out any of the described job activities which include car washing attendant, hand packager, kitchen helper, laundry folder, cafeteria attendant, and motel housekeeper."  (Exhibit 17F)  At the supplemental hearing, Dr. Wood testified that the claimant could

perform the above occupations. The undersigned again asked the vocational expert a series of questions and the vocational expert testified that the claimant could still perform work as a kitchen helper, a laundry folder, a cafeteria worker and a motel housekeeper. The vocational expert again listed the numbers of these jobs and specifically addressed whether and how often they require near and far visual acuity and depth perception. In this regard, she amended Exhibit 13E to reflect her testimony.

(Tr. 32-33.)

The ALJ erred to the extent that she relied upon Dr. Wood's testimony that Bratt is capable of performing all six occupations. "This type of conclusion is outside the medical province: it is for a vocational expert to take into account medical limitations, including opinions as to work time limits, and offer an opinion on the ultimate question whether a claimant is capable of gainful employment." Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995). The error was harmless, however, because the VE testified that a person with no depth perception and with the other limitations listed in Bratt's RFC assessment could still perform four of the occupations.

Exhibit 13E is the report that the VE prepared right after the first hearing. The original contents of the exhibit are summarized in the two tables that were included in the ALJ's decision (quoted above). The amendments that the VE made to Exhibit 13E were not discussed by the ALJ, but they figure prominently in this appeal. First of all, the VE testified that the occupations of carwash attendant and hand packager should be eliminated entirely from the exhibit because they required depth perception. Next, the VE reduced the number of light motel/hotel housekeeper jobs in Nebraska from 1,500 to 985, but increased the number of medium jobs in that category from 1,500 to 2,000. The VE also reduced the number of light and medium kitchen helper jobs in Nebraska from 2,000 each to 1,600 each. These amendments were made by the VE during a vigorous cross-examination by Bratt's attorney questioning the accuracy of the job numbers.

15

The VE testified that his source of information for the job numbers provided in Exhibit 13E was the Employment Statistics Quarterly, a publication that reports job numbers using broad census codes rather than narrow DOT titles.  Because several DOT titles may be covered by a single census code, the job numbers shown in Exhibit 13E are only rough estimates made by the VE.

Thus, for example, the VE testified that he referred to census code 444 (miscellaneous food preparation occupations) to determine the number of jobs for DOT title 318.687-010 (kitchen helper).  The Employment Statistics Quarterly reported that there were 3,807 light jobs and 3,962 medium jobs in Nebraska under census code 444.  The VE originally included about one-half that number of jobs in each category in Exhibit 13E, but acknowledged that there are 10 DOT titles within census code 444.  Upon further questioning, the VE determined that there were 5 DOT titles for light jobs within census code 444, but that 2 of those DOT titles were semi-skilled occupations that Bratt is not qualified to perform.  Consequently, based on a "strict frequency distribution," the VE testified that he would include three-fifths, or about 2,400, of the light jobs in Exhibit 13E.  However, because 1 of these 3 unskilled light jobs required frequent near visual acuity, he would reduce this estimated  number by one-third, down to 1,600.  The VE also determined that three-fifths of the DOT titles in the medium exertional category were semi-skilled occupations, and so amended Exhibit 13E  to include two-fifths, or about 1,600, of the medium jobs shown in the Employment Statistics Quarterly for census code 444.

For DOT title 323.687-014 (cleaner, housekeeping), the VE used census code 449 (maids and housemen) to find job numbers.  The Employment Statistics Quarterly reported that there were 1,970 light and 2,985 medium jobs of this type in Nebraska.  There are 2 DOT titles in the light category, both of which are unskilled occupations; however, the VE concluded that 1 of these occupations would be unsuitable for Bratt because of her visual limitations.  Accordingly, the VE determined that the number of reported light jobs should be reduced by one-half, or down to 985, in Exhibit 13E.  There are 3 DOT titles at the medium physical demand level for census code 449, and

16

2 are unskilled occupations that the VE testified Bratt could perform.  He therefore amended Exhibit 13E to show about 2,000 medium "motel/hotel housekeeper" jobs.

Bratt claims that the VE's testimony was not consistent with the Dictionary of Occupational Titles because it "was contrary to the listed visual requirements for the jobs identified[.]" (Filing 12, at 17.)  Bratt therefore argues that the ALJ was required to "elicit a reasonable explanation for the conflict before relying on the VE[.]." S.S.R. 00-4p, 2000 WL 1898704, *2 (S.S.A. Dec. 4, 2000).  To the extent that the VE's original Exhibit 13E was in conflict with the DOT because the job numbers included some DOT titles with greater visual demands than Bratt was capable of performing, this issue was explored in great detail by Bratt's attorney and the VE conceded that certain adjustments were necessary.  The VE made these adjustments by completely eliminating two occupations listed in Exhibit 13E (car wash attendant and hand packager) and by changing the number of jobs in Nebraska for two other occupations (kitchen helper and motel/hotel housekeeper).  While the VE's testimony on cross-examination by Bratt's counsel is disjointed and difficult to follow, no further explanation from him was required under Social Security Ruling 00-4p.  Also, while the ALJ can rightly be criticized for failing to discuss the VE's extended testimony in her decision, a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency has no practical effect on the outcome of the case.  See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005).

Exhibit 13E, as amended by the VE's testimony, shows that Nebraska has 2,985 light and medium motel/hotel housekeeper jobs, 3,200 light and medium kitchen helper jobs, 6,000 light and medium laundry folder jobs, and 2,600 light and medium cafeteria attendant jobs that a person with Bratt's visual limitations could perform.  The accuracy of these job numbers is questionable, owing to the fact that actual employments statistics are not kept in strict accordance with DOT titles; the VE simply assumed that there are an equal number of jobs for each DOT title within the applicable census code.  The numbers are also misleading because the VE only attempted to factor out DOT titles that required more skill or better eyesight; he did

not make any computation to eliminate all DOT titles except the four occupations that he specifically discussed as being compatible with Bratt's RFC. [7]

That being said, I still conclude that the ALJ was entitled to rely upon the VE's testimony to find that there are a significant number of jobs in the local economy which Bratt can perform.  The VE presumably concluded that a person with Bratt's RFC could perform all of the occupations that are included in the 4 census codes that he provided job numbers for, excepting only those occupations that are semi-skilled or that require depth perception.  The VE also must have considered it reasonable to assume a "strict frequency distribution" for purposes of his analysis.  The VE's testimony in this regard is not as complete as might be desired, perhaps, but "the ALJ's proceedings are not governed by the Federal Rules of Evidence." McClees v. Sullivan, 879 F.2d 451, 453 n. 2 (8th Cir. 1989).  See 42 U.S.C. § 405(a) ("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure.").

In Whitehouse v. Sullivan, 949 F.2d 1005 (8th Cir. 1991), the Court of Appeals had occasion to consider the sufficiency of testimony from a vocational expert that resembled the VE's testimony in this case.  In rejecting the claimant's argument that the evidence did not support a finding that jobs existed in significant numbers in the national economy which he could perform, the Court stated:

> The vocational expert testified that Whitehouse could perform several jobs.  The expert used the DOT code numbers to identify those jobs he believed Whitehouse could perform.  In responding to the ALJ's

_____

[7] For example, DOT title 318.687-010 (kitchen helper) was 1 of 5 occupations with medium physical demands that were included in census code 444.  The VE only factored out 3 of those occupations.  He also kept 2 DOT titles involving light work.  For another example, DOT title 323.687-014 (cleaner, housekeeping) is classified as a light occupation.  However, Exhibit 13E shows an estimated 2,000 medium jobs for "motel/hotel housekeepers."  These 2,000 jobs pertain to 2 DOT titles that were never described by the VE.

questions about the numbers of such jobs available, however, the expert used the job titles from the Job Service statistical summaries of jobs. These summaries do not take residual functional capacity into account, while the DOT does, classifying each job according to the functional level needed to perform that job. See 20 C.F.R. § 404, Subpt. P, App. 2 (section 200.00(b)). For example, while Job Service might list "sales clerk" as a job title, the DOT might further subclassify sales clerk jobs according to whether they require sedentary, light, medium, or heavy exertion.

It is true that the DOT job titles more narrowly classify jobs than do the Job Service job titles.  However, the Secretary may take administrative notice of any "reliable job information", including both the DOT and the Job Service summaries.  20 C.F.R. § 404.1566(d).  In addition, the Secretary may use the services of a vocational expert.  20 C.F.R. § 404.1566(e).  There is no requirement that a vocational expert correlate the DOT titles with the Job Services summaries.  The expert is only required to state his opinion as to the number of jobs available in the national economy to a person with the applicant's residual functional capacity, age, work experience, and education.

We find substantial evidence in the record to uphold the Secretary's decision. . . .  We see no reason to conclude that the expert did not limit the number of jobs available to Whitehouse within a Job Service category according to the factors the ALJ set out.  Therefore, the ALJ properly relied on those answers in finding that there were significant numbers of jobs in the national economy which Whitehouse could perform.

Id., at 1006 -1007.  Similarly, in the present case, I cannot say that the revised job numbers that were provided by the VE were unreliable.

### III.  CONCLUSION

For the reasons stated, I find that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed.  Judgment will be entered by separate document.

June 12, 2007.                              BY THE COURT:

                                           s/ *Richard G. Kopf*
                                           United States District Judge